Our first case for argument today is 24-1309, BJ Energy Solutions v. Evolution Well. Mr. Robinson, please proceed. May it please the Court. Eagle Robinson with Norton Rose Fulbright on behalf of Appellant BJ Energy Solutions. The Board's final written decision should, at a minimum, be vacated and remanded. Should the Court be so inclined, the lack of substantial evidence on necessary underlying factual findings also provide ample basis to outright reverse. This is true for four reasons. First, the Board relied on hindsight testimony of BJ's expert as a lynchpin of both sets of obvious misconclusions. Second, the Board failed to satisfy its APA obligations in each of its obvious misgrounds by failing to explain the reasoning behind the decisions that it made. Third, for the Sanborn-Nates combination, the Board misapplied the legal standard for determining that Nates is an Al-Ghazari. And fourth, for both sets of obvious misgrounds, the record lacks substantial evidence for the underlying factual findings necessary prior to the Board's sets of obvious misgrounds. Beginning with the Board's reliance on Dr. King's testimony that the invention of the 049 patent is an option for fracking, both parties agree that Dr. King was asked about Figure 1 of the 049 patent. Figure 1 is not a prior art figure. How the Board understood Dr. King's testimony is something we give deference to. Is that right? I'm sorry, Your Honor. I didn't catch the first part of that. How the Board understood Dr. King's testimony is something that our Court gives deference to. Is that right? Your Honor, EWS has certainly argued that the Board was entitled to make a finding that that testimony was a prior art perspective, but the Court criticized the PTAB in New Basic. So we do give deference to the Board's findings as to Dr. King's testimony? Had that finding been reasoned and explained, then perhaps there would be a basis for giving deference to it. The Court in New Basic criticized the PTAB for a similar argument, that a finding should be allowed to be implicit, and said there that the Board failed to explain the reasons for a conclusion. Here, the Board fails to explain why or how it could have interpreted that testimony, addressing Figure 1, an embodiment of the claimed invention, how it could have interpreted that testimony as being from a prior art perspective. There's no articulated basis for interpreting it in that way. Well, he gave that testimony, that deposition, in 2023, right? And we're talking about a priority date in 2013. Is there something in those 10 years in the relevant art here that would lead one to wonder if maybe the pump motor pump is a suitable option in 23, but wouldn't it have been a suitable option in 2013? Your Honor, I would say that there are things missing from the art that would lead it to affirmatively believe that it was not a suitable option, specifically that there is not a single example in the record of a prior art system, pump motor pump configuration, that was capable of, much less suitable for, fracking. EWS makes a lot of the JANG reference with a J as being a fracking system that included a pump motor pump configuration, but both sides' experts agree that that pump motor pump configuration was an ancillary element, that it was not capable of fracking, and that the pumps that JANG actually used for fracking were not in that configuration. So what if we feel like we must give deference to the Board on Dr. King's testimony? Then where does that leave us? Your Honor, even if the Board were to reach that conclusion, there are other bases for both vacating and for reversing. Specifically, in terms of APA obligations, the Board, as one example, the Board explained that patent owner BJ's motion to strike had merit, that it would not be relying on parts of the reply that were subject to that motion to strike, and then it explicitly did rely on parts of that reply that were subject to motion to strike. So that's one example where the Board, on its face in its final written decision, has taken an action inconsistent with what it said it was going to do, while not resolving the merits of what it said was a meritorious motion to strike. Now, that's one example, but it's relevant because the petition and EWS's expert did not support, and the Board did not provide reasoning. This is for the Zang-Stout combination, right? I don't think what you're arguing now about the motion to exclude motion to strike is as relevant to the other combination. Sanborn-Nates, right? I'm sorry, Your Honor. Sanborn-Nates, that combination. It is relevant to Sanborn-Nates, specifically because the Board explicitly said at page 626 of the appendix that it was dismissing patent owner's arguments for the same reasons set forth above for the Zang-Stout combination. I guess the point is, is that with the Sanborn-Nates, the Board found that Sanborn itself teaches using a motor with two pumps, right? That is what the Board found. Yes, Your Honor. And it just became a question of, well, where are we going to orient the pumps vis-à-vis the motor? And so because of what Sanborn already teaches, then we don't have to worry so much about whether we would even select using a motor with two different pumps, which is, I guess, the problem you want to raise with the other combination. Well, Your Honor, even in that instance, well, there are a number of issues with that Sanborn-Nates combination. First, if we focus just on this issue that you're asking about, that Sanborn suggests that a single motor can drive two pumps, Sanborn doesn't say how a single motor can drive two pumps. Sanborn says there are options known in the art. Well, the art is fracking systems. The Board explicitly found that Nates is not in the field of Sanborn. So to the extent we look at that as a teaching suggestion or motivation, it's not referring to Nates, which is not in the same field. If we go one step further to how do we actually drive two pumps with one motor, certainly if you're looking to known configurations in this fracking art, a pump motor pump is not in it. There's no example of a pump motor pump configuration being suitable for fracturing. It's just not there. And then if we look at what the Board actually said about simplification, which is the only motivation that was credited, sorry, the only motivation in addition to the teaching suggestion motivation, which again referred to a different field than Nates. If you look at simplification and what the Board actually said, there's no benefit of simplification. What the Board says is essentially eliminating a motor is a benefit in and of itself. But the Board overlooks that we're not just taking away one of two motors. We have to replace that with a bigger motor. And so Sanborn, the Board starts with one motor driving two pumps, and it says, well, you would simplify it by removing a transfer case. And, in fact, what the Board said at page 626 of the appendix is, we understand Petitioner argued that directly driving each of the two pumps with one motor rather than driving the pumps in another manner, such as serially, would eliminate the need for additional equipment that would otherwise be needed to drive two pumps. Petitioner provides examples of such additional equipment that would not be needed, including a transfer case, presumably to split power from a single motor into two pumps. We find this argument persuasive. The problem here is there's no comparison within Sanborn of eliminating a transfer case. In fact, if you look down on that same page. My understanding of what the Board was getting at was, we have to start with a premise with Sanborn. It already teaches the notion of having a motor driving two pumps. So now the next question is, where are we going to put those two pumps in relation to the motor? There's two options, motor-pump-pump or pump-motor-pump. And then the Board right there is basically agreeing with the Petitioner that there's a lot of problems and extra complications when you do a configuration of motor-pump-pump. So that's why there would be a stronger motive to do pump-motor-pump, which is your claimed invention. Respectfully, Your Honor, there's no basis to conclude that those are the only two options. Petitioner didn't establish that and the record doesn't establish that. There are multiple options that are in the record for fracking. What would be another configuration? Pump-pump-motor? That's kind of like motor-pump-pump. So within a motor driving two pumps, there are serial configurations. There are parallel configurations. The only configuration that's not in the record for fracking is pump-motor-pump. But even within one pump driving multiple motors, there are multiple configurations that are possible. Notably here, the Board said we're going to eliminate a transfer case. But on that same page, paragraph 626, that was the simplification there. We're going to eliminate a transfer case. But on that same page, 626, the Board credits a description from EWS's expert describing the same serial configuration that it's purportedly comparing to, and it doesn't include a transfer case. So there is no basis to say we're going to simplify this configuration by foregoing a transfer case. There are multiple configurations in the record that are not pump-motor-pump. And so the Board is left with this simplification theory with Sanborn and Nates, two very disparate fields, of saying we're going to forego this. But the comparison is a ghost. It's ephemeral. In one instance, it has a transfer case that we're going to forego. In the same page that the Board credits, it doesn't have a transfer case that we're going to forego. So the Board doesn't have a reference point with which to compare. With that, I see that I'm into my rebuttal time. If Your Honors have any other questions, I'd be happy to answer them. Otherwise, I'll reserve the rest of my time. Sounds good. Thank you, Mr. Robinson. Mr. Darby. Good morning, and may it please the Court. Kenneth Darby for the Appellee Evolution Wealth Services. We ask that you affirm the Board's decision because it is thoroughly explained and amply supported by substantial evidence. I'll pick up on the Sanborn-Nates combination where we left off with counsel's presentation. And, Judge Chen, you're right on in terms of Sanborn expressly teaching, and the Board made a factual finding on this, that Sanborn teaches to drive multiple pumps with a single motor, and that's A625. And so once we have that expressed teaching in the Sanborn reference, we look to the person of skill and the art to determine which configuration to use in order to do that. And pump-motor-pump was one of the known configurations. There was some talk about the Jang reference with a J. Make no mistake, that is a reference about hydraulic fracturing. And so if I could point you- It's a different order of magnitude when it comes to the motor and the pump, though, right? That's correct. It's not a fracturing setup that's like on a trailer that you would drive to a frac site. It's a downhill tool for fracking, and yet it's hydraulic fracturing nonetheless. And so when we ask ourselves, what would a person of skill and the art have known, would they have known about pump-motor-pump in the context of fracturing? They absolutely would have. And there's nothing in the law that would require it to have been exactly in the context of the patent. We would be talking about anticipation if that were the case. But what we have is we have a clear teaching in the art in Sanborn to drive multiple pumps with a single motor. We have a known configuration in terms of pump-motor-pump, which was used in all sorts of different contexts, including in hydraulic fracturing. And getting from one place to the other is the very sort of thing that we rely on the person of skill and the art to get us from A to B. Counsel's argument about Dr. King, I'm looking in particular at pages 2394 and 2395 of the appendix. I think that's the testimony they point to. What response do you have to their argument that Dr. King is testifying very much in a present voice, is, would be, and not in a voice that recognizes that the time period that's relevant is the time of invention and not the present day? He is talking about the 049 patents, figure one. That's what he was asked about, and we were up front with the board about that. We had a talk with them at the oral hearing, and we made that very point. Here's what happened. The pump-motor-pump configuration of the 049 patent, we asked him during deposition, do your drawbacks apply to figure one of the 049 patent, that pump-motor-pump? Yes, he said, they all apply. Okay, and is the pump-motor-pump configuration still fine? He says, yes, it's fine. Here, in addition to your earlier question, is there anything new that's happened between the 049 patent and the critical date and the present tense? I would submit that the answer is no. In fact, the 049 patent concedes that a lot of the technology is already known. But importantly, what the board did here is what we explained to them, which is if all of the drawbacks apply to 049 pump-motor-pump, and there's no distinction between the prior pump-motor-pump, that it's appropriate for the board, as the fact finder, to make a reasonable inference, which is if it's fine for 049, it's also fine for the prior pump-motor-pump. And so that's the reasonable inference that the board made. And I would submit that it's not a necessary component of the board's final written decision. And so I would also say that the court doesn't need to reach that issue necessarily in order to affirm the board. If you were to take those sentences about Dr. King's testimony, and let's just say we wipe them out of the final written decision altogether, and we just pretend they didn't exist, would the result be any different? We submit the answer is no, because the board had already made the necessary factual findings. It already found the motivation. It already looked at the drawbacks and found that those weren't credible and that they were unavailing. And so, again, we would submit that that's not a necessary part of the board's decision, and you don't actually need to reach it. But it's definitely a fact issue. Interpreting the expert testimony and making reasonable inferences from it is the role of the fact finder, and it's a fact question to which the substantial evidence standard applies. So are you conceding that Dr. King's testimony was about the present day, when he was talking about that there were some benefits to this combination? I wouldn't concede that he was talking about present day. I do think he was talking about the 049 Patents Figure 1, and that's what we asked him about. And what we're saying, though, is that the board made a reasonable inference from there. It doesn't apply only to the 049 Patents Figure 1. It applies equally to the prior art as well because there's no distinction between them. So if his drawbacks don't make pump motor pump unsuitable for 049, those same drawbacks also don't make the prior art unsuitable either. Both of them are fine, and that's the way the board interpreted the testimony, and that's the way the board drew a reasonable inference from the testimony. Well, I mean, the question isn't would it have made them unsuitable. The question is what would a skilled artisan have understood at the time about them, right? That's correct. Absolutely correct. So the point of the testimony— I mean, your inference is fair. If these drawbacks are true with regard to 049, those same drawbacks are true, but not necessarily were those drawbacks known to a skilled artisan at the time. I think that— It's still on the motivation to combine portion, right? I think that's fair, and I agree that we need to be taking the perspective of the skilled artisan— At the time of the invention. Absolutely. And I think when we're looking at the testimony, it's really about undermining the credibility of these drawbacks being something that would render pump-motor-pump unsuitable, right? And so when we ask ourselves are these the kind of show-stopping drawbacks that would make it unsuitable, I think Dr. King is pretty clear that he doesn't think they are. Now—and again, the board had already made findings on the drawbacks and found them unavailing and unpersuasive, and that was all setting aside Dr. King's testimony. It doesn't come into play at all because there were drawbacks that we had, the back-and-forth about that. It was a battle of the experts on that. One of them was reliability. BJ Energy Solutions said you need a bigger motor, and the bigger motor wouldn't be as reliable. That turned out to not be credible because the experts hadn't looked at the underlying data, and there was no credible evidence on that, for example. So one concern with the board decision is that it refused to consider the patent owner's motion to exclude portions of your reply as well as portions of your expert supplemental declaration because the board said it wasn't going to consider any of those, so it didn't need to rule on the motion. And yet at the same time, in the board decision in different places, it actually cites to and relies on some of that content that the patent owner sought to exclude. So it seems like there's some confusion here as to what the board's intentions were and whether there's a defect in the board's decision on that score. Can you comment on that? Absolutely. I think the answer to that question is that the board didn't rely on anything that BJ Energy Solutions complained about in terms of being impermissible, new argument, or evidence. And so the motion to strike— Well, I thought the motion to strike included some of your rebuttal on the question of this proposed combination would require a larger motor, which would have a much higher failure rate, and also have the disadvantage of having a single point of failure with only one motor as opposed to having two motors. And that was content that they wanted to exclude. The board promised it wasn't going to rely on any of your argument or evidence and then, in fact, did rely on some of that argument and evidence. So therein is the problem. My recollection of the motion is that it sought to strike large swaths of the reply and so on and so forth. But when you look at the arguments, the actual things that they complained about being impermissible and being new, I don't believe it was the items that the board relied upon. I recall them complaining about issues like cost savings and space savings and those sorts of things as being impermissibly new. I don't recall them arguing that the response, which was a responsive argument, they raised these new reliability concerns, and we responded to those. I don't recall that being part of what they were asking to strike, although, to your point, I mean, there were large sections of the reply that they sought to exclude. But I think what the board was doing here, and it was reasonable to do it this way, is if we're not going to rely on that which you're complaining about, the motion truly is moot. I understand that you've asked to basically strike the entirety of the reply, but the things you're complaining about aren't the things that they're relying on. I think that's what the board was saying, and I think that's what the board's faithfully did. I don't think they relied upon anything that BJ Energy Solutions actually said was new and improper. The response to the reliability issue, for example, and that's clearly a responsive argument. It wasn't a new theory of patentability or anything of that regard. I guess I'm wondering, is the Sanborn-Nates combination a cleaner combination in terms of getting away from this motion to strike motion to exclude conundrum? I think that in some fashion it can be. In terms of the responsive arguments, I think they would apply to both because they argued the drawbacks for both grounds, to be fair. But in terms of some of the comparison and space constraints things, I think it's possible that those apply more to the Jank Stout combination. Sanborn already has a single motor driving two pumps, so therefore it's already there. You don't need to modify a prior art reference to get to a single motor and two pumps, which then creates the question of why would you ever have a single motor. It's already there. You're absolutely right about that. And there's the express finding by the board on the Sanborn combination. So to the extent it's cleaner in that way, I agree with you. There's not really a need to do very much comparison here because Sanborn doesn't have something that it's starting with. And there was a big argument below about the Jank reference and whether it's two pump motor sets or whether it's pump motor pump, which that was our position below. But in Sanborn we don't have that, to your point. There's the express finding. And so the idea that you have to compare it to something I think isn't there in the same way. And so I do think it's cleaner in that sense. A lot of the things complained about in the motion don't apply nearly as much to the Sanborn-Nates combination, to your point. Anything further? No. I will happily see the remainder of my time then. Actually, I'm sorry. I just have one question. The second combination, the Sanborn combination, invalidated fewer claims than the Zang combination, right? I believe the two sets. So there are two sets of grounds. We sort of merged them together because there were extra tertiary references that were added into the combinations. But there's one set of grounds that's Zang-Stout. There's another set of grounds that's Sanborn-Nates. They both, if you take them as sets of grounds based on those sort of baseline references, they cover the same claim sets. All right. Let me just confirm that for you. Okay. And the reason I ask is I just wonder whether it makes any difference to you if there are extra claims in the Zang-Stout combination, whether any of those extra claims actually matter to you. I think they're the same. And so I point you to A, 639 and 640. This is the table at the end of the board's final written decision. And one of the things I have highlighted here is Claim 10. It's because Claim 10 is actually on the next page. It's on 640 as being taken care of in the Sanborn-Nates grounds. So I think in both sets of grounds, it's Claims 1 through 3, 6 through 8, 10, 12, 13, 15, and 18 through 20. All right. Thank you. Absolutely. Thank you, Counsel. Absolutely. Thank you. Mr. Robinson. Undisputed documentary evidence says, quote, there's very little design criteria or construction details that could be directly transferred between Sanborn's pumps and Nates' compressors. Analogousness is the hook to get from Sanborn to Nates. And the board expanded one or more problems that the inventors were faced with to any design choice that the inventors were faced with. Specifically, the board focused in on the flex couplings. The problem with using the flex couplings to get to Nates to get the pump-motor-pump configuration is that nothing in the record suggests that you need those flex couplings in this context until you get to a pump-motor-pump configuration. And so that's why that analogousness standard made a difference here, is that you start with The red brief points out that during the prosecution history, the applicant added the flex coupling limitations to overcome a prior art rejection. And that, according to the notice of allowance, was the basis for why the examiner allowed the claims. Is that right? That is a partial characterization. So what happened was the applicant added flex couplings to distinguish a piece of prior art that did not have a pump-motor-pump configuration. The applicant then added the direct coupling for the pump-motor-pump configuration, and it was that combination of two things that was able to overcome the Gambier reference, which, to your Honor's point about sort of one motor driving two pumps being known, Gambier had one motor driving two pumps. It was not a pump-motor-pump configuration, and it did not include those flex couplings. And so what we have here in the 049 patent is that flex couplings become useful in this pump-motor-pump configuration to deal with misalignment. There is nothing in the record that suggests that there was any need for flex couplings before you get to the pump-motor-pump configuration. And so to use flex couplings to get to Nate's to get the pump-motor-pump configuration is exactly what the Board has done, and it illustrates the fallacy with how the Board has applied that standard for analogous art. The Board expressed in its institution decision skepticism about the predictable results finding and appears to have come around to adopting that based on Dr. King's testimony. Dr. King's testimony was not without effect. It was referenced in the Board's findings for Sanborn and Nate's, the same dismissal of the drawbacks. Now, this problem with the Board's failure to weigh the benefits and the drawbacks is the benefit is purportedly simplification, but there is no reference against which anything is being simplified. There is no series configuration that has a transfer case that we're now going to avoid. It's just not in the petition. In fact, again, on page 626 of the appendix, the Board credits Mr. Marsher's description of a series configuration to address reliability that doesn't include a transfer case. And so there is no frame of reference from which to simplify Sanborn and Nate's. Can't we understand the Board's simplification to simply be the reduction in the number of parts? Eliminating the need for parts necessarily results in simplification. Your Honor, the problem is we don't have any frame of reference with those parts to eliminate. It's a raw number. The Board found that there would be a reduced number of components necessary. Isn't that simplification? Well, one, there's no frame of reference from which to conclude that parts are being reduced. Two, no, that's not a basis to conclude that something is being simplified. I think most mechanical engineers would disagree with that. And even if they wouldn't disagree, I think that under the deferential standard of review, if you can eliminate the need for component parts in something, you've simplified it. Your Honor, I'm going to refer back to Zhang Stout because it helps illustrate this point really well. Zhang simplifies to one pump motor set, one pump motor set. When you eliminate one of those motors, you have to put a pump onto the first motor, which results in a more complex structure of one motor driving two pumps. Rather, even though it's fewer motors, it's a more complicated structure, and that's exactly what our expert testified to. But that's a question of fact, and we refer to the Board for its fact findings about whether that change resulted in a simplified system or not. Your Honor, I see that I'm passing my time. May I briefly answer and conclude?  All right. So I think the best place to point you to here is the petition. The petition doesn't just say simplification. It says simplification to save space and improve reliability, which is what Zhang says. We're not simplifying for the sake of simplifying. We want benefits. The Board didn't credit, and in fact, at 214 in its institution decision, rejected that. That's not relevant. We're not reviewing an institution decision. In fact, we don't even have the power to review it. We're reviewing an FWD. Your Honor, the point is all of the benefits that were purportedly attributable to simplification were rejected by the Board, leaving simplification as a—  When were they rejected by the Board? Not in the final written decision? Not in the final written decision, Your Honor. Presumably because they outright rejected them in the institution decision. That's a presumption I'm not going to make. Well, fair enough, Your Honor. Thank both counsel. The case is taken under submission.